Mason, J.
The plaintiff claims to be entitled to the injunction prayed for in his complaint, upon two grounds. First, he insists that the common council of the city, for a valuable consideration, contracted with Trinity church that the space lying west of Washington street, and between Reade and Duane streets to the river, should always remain open as a public square; and, secondly, that if there were no such contract, there was a dedication by the common council, of the space in question to that object.
I will briefly examine both these grounds :
I. Was there any such contract between the common council and the church ? For the purpose of this inquiry, I shall assume that the plaintiff’s title is derived from the church, and that he has the same right to file the complaint which the church would have had -were they now the owners of the premises granted to them by the common council.
It appears from the evidence, that Reade street was originally laid out- to run parallel to Chambers street, from Broadway to the river; so that when extended it would strike Duane street, which then, as now, ran at right angles to, the river, at the easterly corner of Duane and West streets.
In May, 1789, the common council, by resolution, agreed to • make a grant to the church of the soil from high to low water mark, and thence two hundred feet into the river opposite to their land, between Chambers and Reade streets, reserving a quit rent of one shilling per foot in front.
This quit rent was to commence at" the expiration of twenty-one years, but by a subsequent resolution a few days afterwards, the quit rent was ordered to. commence at the expiration of forty-two years.
There is no evidence as to the time when a grant was formally made out and delivered in pursuance of this resolution. It had not been delivered in' May, 1794, for on the fourteenth day of that month, a committee of the common council, in a report to that body, recommended that, the grant theretofore promised to the church, of land under water,. between Chambers and Reade streets, be limited so. as to make Reade street,, from the east corner thereof on Washington' street, parallel with *601 Duane street. They also recommended that the church be requested to release to the corporation of the city, the upland adjoining the river west of Washington street, and between Reade and Duane streets, and to these recommendations they subjoin the remark, that if the two objects be attained, a spacious square would be formed between Washington street and the new street intended, in the front of Hudson river, and open to the harbor.
This report was adopted, and the proposals contained in it were a few days afterwards acceded to by the church.
It is contended by the counsel for the plaintiff, that these proposals, and the acceptance of them, formed a contract between the church and the city, by which the city was bound to keep the space in question open for ever after as a public square. The church, it is said, gave up a portion of their property to the city, and the consideration of their doing so, was the agreement or promise by the common council, that the space in question should for ever afterwards remain open, thereby securing a greater value to the property of the church, which fronted on the proposed square.
Admitting the correctness of the position contended for by the counsel for the plaintiff, that the church had acquired by the resolution of May, 1789, an equitable title to the lands therein agreed to be granted, which might have been enforced in chancery, and that the common council therefore could not rightfully have refused, against the will of the church, to include in their grant any part of the land south of the original line of Reade street; yet I cannot perceive any evidence of such a contract as is insisted on by the plaintiff's counsel, or that the square was the consideration for which the church agreed to release a portion of their right.
It does not appear that the purpose for which the common council wished a release of the upland, and a restriction of the water grant, was communicated to the church. It formed no part of the proposition to be made to the church; it is simply a remark by the committee, as to the benefit that would result to the city if the proposals should be acceded to, not as to the advantage to the adjacent proprietors ; nor is there any allusion to the square in the answer of the church. There is no evidence *602 that the church took any other action in the matter, than simply to authorize Mr. Carman, who, it seems, was a member of both corporations, to inform the common council that they acceded to the proposals, but the object of the common council, in making the proposal, so far from being the consideration of their acceding to it, is not even alluded to. But if the church did know, as it is probable they did, the object of the common council in making the request, it would be difficult to infer a contract for the benefit of the owners of the adjacent lands, from the expression of a wish or desire to reserve the land for the benefit of the public. If it were the intention of the church to secure the benefit of the square to themselves, or to the pxiblic, that intention would surely have been. expressed in some formal and authentic manner ; and in the absence of any such expression, we are authorized to infer that the intention never existed.
There were sufficient motives to induce the church to accede to the proposals of the common council, independently of the idea of a contract. In the first place, the land under water proposed to be given up, was of very little value in those days, and in that part of the city. This is manifest from the resolution for the grant. • It was agreed to be given without any pecuniary consideration paid for it, and subject to a very trifling quit rent, and that rent not to commence running for nearly half a century. The upland released also was of very small dimensions, as appears by the maps, and could not have had more than a nominal value. The church, moreover, stood at that period in a peculiar position towards the city corporation ; they had just applied for a water grant, from Duane to Jay street, which the common council at first refused, but shortly afterwards, on learning that it would be a great convenience to the church to have the land, in order to deposit upon it the earth obtained by digging out Greenwich street, the matter was reconsidered, and the grant agreed to be given. The only condition imposed, that Greenwich street should be forthwith dug out, and a bulkhead be built, was cheerfully and promptly assented to by the church, and they also tendered their thanks to the common council for the favor they had done them. It was at the same meeting of the common council at which the acceptance of the condition *603 of the grant, and the thanks of the church were received, that the resolutions before mentioned, respecting the proposed alteration of the line of Reade street, were passed. It seems to me that we need look no further than the circumstances just stated, for the considerations or reasons of the church’s compliance, and prompt and ready compliance with the proposals of the city corporation.
The idea then of a contract between the church and the common council, for this square, must, I think, be abandoned.
II. The next question is, has the plaintiff shown a dedication of this piece of ground to the public for an open square ?
If there was in fact such a dedication, the authorities cited abundantly show that the property cannot be diverted to any other purpose at the mere will of the common council. The dedication cannot be revoked. Whether or not the legislature, in the exercise of the. right of eminent domain ; or the common council, clothed with the delegated powers of the legislature, could take the property for other public purposes ; or, whether, in such case, compensation must be allowed, as if it were the property of an individual, are questions not necessary to be now considered ; for it cannot be seriously contended that the appropriation of this space of ground to the Erie Railroad Company for a depot, is such a public use, as to justify the exercise of the right of eminent domain.
What is then the evidence of a dedication ?
It must be found either in some act of the common council in terms creating the dedication, or from such an actual use of the property as that an act of dedication may be properly inferred from it.
1st. The only act of dedication relied on was the adoption by the common council of the report of the committee before referred to, in July, 1794.
All that the committee say on the subject is, that if the church accede to the proposal they recommend should be made.to them, a spacious square will be formed ; a piece of information to the common council, which, with the map before them, would seem to have been superfluous. The obvious effect of throwing back the line of Reade street, as proposed, would be to. leave an open space or square. It was said, however, that the word *604 “ square ” has the same general, meaning as the word “ street,” and that it imports ex vi termini an open space of ground devoted to the public use, in the same manner as a public street, laid out by the proper authority ; that the adoption, therefore, by the common council of the report was of itself an act of" dedication. I am not aware of any parliamentary rule, according to which, the adoption by a legislative body of a report of a committee, recommending definite action, is also an adoption of all the remarks made by the committee in the course of their report, especially if those remarks are not necessary for the proper understanding of the acts recommended. All that the committee in this case recommended was, that the church be requested to relinquish a portion of their upland, and that they consént to a restriction of the grant promised' them. It would be giving a wondrous power to this very obvious remark of the committee, as to.the result of a compliance with the request, if it should be held to exclude the common council from ever making any other use of the ground.
It is also to .be observed, that the statutes- referred to, in which the word “ square” is used in a sense synonymous with the word “ street.” had not at that time been passed, and no authority was cited to show that independently of these statutes, in strict legal phraseology, the words are synonymous. But, however that may be, it is apparent, I think, on the face of the report, that the “ square” was used by the committee not in a technical, but in a popular sense, and that it simply means, an open space. In the absence then, of any resolution or affirmative-act .by the common council founded on the assent of the church to the proposal, I should not be warranted in holding the mere adoption of the report to be an act of dedication.
2d. Has then the subsequent use or appropriation of this piece of ground by or with the consent of the common council been such as to prove a dedication ?
The : plaintiff contended that it has; and in support of this position referred to the map annexed to the grant to Rhine-lander. • The grant is dated in 1807, but the map appears to have .been copied from a survey by Charles Loss, and the extract .from Loss’s map annexed to Thurston’s affidavit, gives the-date of this map as Aprils 1799.
*605 On both of these copies the word “ market ” is written in the place designated for the square, the map'annexed to the grant indicating, by the coloring, an actual market house. These maps the counsel for the plaintiff produced, and relied on as evidence of the recognition by the common council of the dedication of the ground as a public square. In my judgment, they prove directly the reverse. The erection of a market house is entirely inconsistent with the dedication of the land on which it is erected for an open square. It is the assertion of a right to erect buildings upon* it; buildings for public purposes, it is true, but yet buildings which might, if the public convenience required it, cover the whole space. It is no answer to say that the market house was erected with the consent of the proprietors of the adjoining land. Their consent could not affect the question. It would be very important, if the common council had entered into a covenant or contract that the space should be kept open for their immediate benefit, because then the church and their grantees might lawfully waive the benefit of the square for the greater benefit of the market: but if there was no contract, and the right to the square depended on dedication, then the whole public were interested, and the adjacent proprietors could not, any m.ore than the common council, deprive the public of their right to have it kept open. The erection of a market house, even with the consent of the adjacent proprietors, does not establish a dedication. On the contrary, the fact that as early as 1799, only five years after the supposed dedication, the space was designated as a market-place on a public map, made by a city surveyor, and which was afterwards treated as authentic by the common council, is a strong argument to show that there was no dedication of the ground for a square ; and the actual erection of the market house previous to 1807 is conclusive evidence that the place was not, in fact, used as a public square.
In truth, the whole history of this space of ground is at variance with the idea of a square. The erection of hay scales, a milk stand, an engine house, all show, that the corporation- of the city used the property for such general purposes as the public convenience from time to time required.
The market was in existence from 1806 to 1880, a period of *606 nearly twenty-five years, and the other erections probably for the greater portion of that time, without complaint' from any quarter. They were taken down and removed because they were no longer needed for public accommodation. But it is said that since 1830, and until shortly before the commencement of this suit, the space has been kept open without any buildings, and for a portion of the time inclosed with a fence, and that Messrs. Herring and others, proprietors of adjoining property, whose consent appears to have been asked for the removal of. the market, while they gave their consent to that object, added to it a consent that the ground remain open as a public square, until the corporation should think fit to rebuild the market. This is, however, no evidence of a prior dedication, and the consent of these individuals imposed no obligation on the common council to dedicate the ground at that time, unless, either the parties giving their consent had a right to insist upon the establishment of the square, as a condition to their relinquishment of the market, or the common council expressly agreed to it. That they had no previous right to a square I. have endeavored to show ; and the power of the common council to remove the market without the consent of the proprietors, is also undoubted ; for it is well established law that when the public convenience requires the location of a market to be changed, it is not only the right, but the duty, of the party enjoying the franchise of erecting markets, to make such change, by discontinuing the old market, and erecting another elsewhere. (Crabbe on Real Property, § 680; Curwen v. Salke, 3 East. 538; Mosley v. Walker, 7 B. and C. 41.) The common council' then were not bound to keep open the ground by reason of this consent or condition, nor did they make an agreement that it should be kept open. The committee who reported on the subject, say in their report, that an unity of sentiment prevailed among the parties interested in favor of having the space of ground on which the market stood thrown entirely open, which would not, they added, prevent the re-establishment of a market, at the" same place, or the use of it in any other way for public convenience, which might be deemed expedient at a future day. Here the committee not only reject the idea of a public square to be kept open with the "single exception in favor of a market, *607 but expressly assert the right to use the ground in any other way that public convenience might require ; and the resolution of the common council simply directs the removal of the market and its appurtenances, and “ that the ground upon which the same stood be paved and regulated.”
I have thus examined all the material facts on which the .plaintiff's claims to an injunction rest, and I confess, I cannot find in them sufficient evidence to justify the conclusion that. the land in question was dedicated to the public for a square, as was contended for by the counsel for the plaintiff. I have looked in vain for any contract to that effect between the common council and Trinity Church, or for an act of dedication, independently of any contract; and the evidence from use, instead of supporting the claim, is exactly the other way.
The evidence, however, does, I think, show that the ground was reserved-by the corporation of the city for public use or convenience. According to the original course of Reade street, there would be an irregular piece of ground between it and Duane, and perhaps, Jay street, which could not be advantageously used for private dwellings, and which would naturally strike an. observer as a suitable site for some of those numberless public uses for which such plots of ground are wanted in a large city. It appears from the report of a committee of the common council, April 1, 1794, that when the church first applied for a grant of water lots between Reade and Jay streets, and the application was denied, as before mentioned, the reason assigned for the denial was, that the common council had reserved those lots for public use, and although, when the grant was agreed to be given in the month of June thereafter, nothing appears to have been Said about this reservation, yet it is worthy of remark, that at the same meeting of the board, at which the acceptance by the church, of the terms of the grant, was reported to the common council, the proposal was made to alter the line of Reade street, so as to make it run parallel with Duane street.
It can hardly be supposed that the common council had forgotten or entirely given up the contemplated reservation for public uses. On the contrary, it would seem fair to infer,- that the alteration of the line of Reade street was proposed and *608 carried into effect in order that while the church was accommodated, the original plan of reserving a piece of ground for public purposes, might also be carried out. The whole seems to have been one transaction, in substance, if not in form, and the subsequent history of the ground in question is in accordance with this idea.
There is a manifest distinction between a dedication and a mere reservation of land, which was admitted by the learned counsel for the plaintiff. The former is irrevocable, and the owner has no power or control over the property inconsistent with the terms of the dedication. The latter imposes no obligation on the owner ; his control over the property continues, and he may exercise the right of an owner as fully as he could before. Its actual application to public uses, as for the site of a court-house' or jail, an almshouse, or any other similar purpose, especially when the reservation is made by a municipal corporation, does not deprive the owner of the right of resuming the entire and absolute disposition and control over it, when no longer wanted for the purposes to which it has been applied.
Such, it appears to me, is the light in which the-space or square in question is to be viewed, simply as reserved by the common council for public convenience, of which they alone were the judges, and without relinquishing the right' of applying it to any other purpose, whenever they should think proper.
I am authorized by Mr. Justice Duer, who assisted me on the hearing of this motion, to say, that he entirely concurs in the views, which it has been my effort to explain,-and in- the conclusion at which I have arrived.
The motion for an injunction is denied, with ten dollars costs to each of the defendants.